JiSCHOTT, Chief Judge.
Defendant was charged along with two co-defendants, Evans and Bell, with first degree murder. A motion to suppress the identification was denied, and a motion was granted severing defendant’s case for trial. At a previous trial Bell was acquitted and Evans was convicted of second degree murder. At his trial defendant was convicted of second degree murder and he was sentenced to life imprisonment.
A review of the record for errors patent reveals none.
Officer Peggy Martin testified that on August 5, 1993 at 3:00 a.m., she and her partner, Officer Marcel Foxworth, answered a call of an aggravated battery by shooting at Julien’s Food Store, which is near the Fischer Housing Project. A crowd of thirty people stood outside the store, and ten officers were already on the ^scene. They found the victim, Ike Wilson, face up in a pool of blood. Two other victims had also been shot: Darlene Thompson and Mark Hendrix, both of whom had been shot in the leg. She said that Julien’s was located around the corner from Michelle’s Bar. No one on the scene identified the perpetrators. She later went to JoEllen Smith Hospital where she learned that Wilson had been shot thirty-two times, and that he had died. She then went to Louisiana Medical Center where she learned that Thompson had suffered four gunshots to her legs, and Hendrix had suffered one gunshot to his leg. She spoke to Hendrix but he did not provide her with any information.
Burmegene Wilson, mother of the victim, admitted that her son had drug problems which interfered with potential college football scholarships. He had been taking classes to satisfy college entrance requirements, and had been staying at her father’s *547 house which was near to the school. Hendrix, who is Burmegene Wilson’s stepbrother, and thus the victim’s “uncle”, also stayed at that house. She said that Hendrix was killed seven days after her son. She did not know the defendant, Bell, or Evans. On cross, defense counsel asked her whether she thought that the victim’s involvement in drugs had precipitated the killings, but she said she did not know.
Officer Carl Palmer, of the crime lab, said that he photographed the scene, and that he found nine 9 mm. casings and ten rifle casings on the scene.
Detective Michael Mims testified he interviewed Thompson at the hospital. He also said Tywanda Major was interviewed that night, but that he did not speak to her at that time. He knew that Major had viewed some photographs. As a result of the information, he obtained arrests warrants for the defendant, Bell, and Evans. He said that he later met with Thompson at a hotel on St. Charles Avenue. The officers moved her to the hotel because her life had been threatened. He ^showed her photographic lineups of Bell and Evans, and she identified the two men. He showed her a photographic lineup containing a two year old picture of the defendant but she was not able to identify him. He said he also spoke with Hendrix. He then sent Thompson and Major to California to live under assumed names. He was subsequently unable to contact Major.
Officer Clarene Gillard testified that some time after the murder, he and his partner Mark Mumme received a call that the defendant may have been at 1304 Bartholomew Street. They proceeded to the residence and spoke to the defendant’s mother and brother. His mother told them that the defendant was there, and she invited them in. As they entered the house, the mother screamed excitedly, “Troy, where are you going?” and “Don’t shoot my son.” He and his partner chased a man, whom they assumed was the defendant, through the back door and over several fences, but they were unable to catch him.
FBI Agent Victor Vasys, said that he apprehended the defendant September 16,1993 after a raid on an apartment in the Fischer Housing project. The defendant once again tried to escape, but he was captured after an elaborate chase.
Paul MeGarry, forensic pathologist with the Orleans Parish Coroner’s Office, testified the victim suffered twenty gunshot wounds. There were two types of wounds: some typical of handgun wounds and some typical of rifle wounds. The trajectories of the bullets indicated that some of the wounds were suffered while the victim was standing and others were suffered when he was falling or had already fallen. He said alcohol, cocaine and morphine were found in the victim’s system.
Officer John Treadaway, a NOPD firearms expert, testified that at least two guns were fired in this case.
LMargaret Bridgewater, wife of Ike Wilson’s grandfather and mother of Hendrix, said Wilson and Hendrix were both staying at her house. When she returned home from work at 5:00 p.m. on the afternoon before Wilson was killed, Wilson, Hendrix, Patrick Jackson and the defendant were at the house. She said the defendant’s nickname was “Nokie.” Wilson left the house first, driving a maroon Monte Carlo. Then, Hendrix, Jackson and the defendant left in Jackson’s white pickup truck. Wilson returned to the house with a girl to pick something up. They were on their way to a party. Hendrix and Jackson then returned after dropping off the defendant. She said that Hendrix told her who had shot him and that she was surprised. She said that Hendrix did not return to her house after he was released from the hospital because he was afraid that someone would kill him.
Thompson testified that she had moved to California because she felt her life was threatened. She said she knew Evans, known as “Combread”, Steven Bell known as “Weebe”, and Major for some time prior to the crime. Major picked her up on that night and they arrived at Michelle’s at 12:10 a.m. They saw Joyce Johnson at Michelle’s and the three of them left together. Outside, they saw Evans, Bell, and the defendant leaning against a red car she believed was a Sentra. Wilson was in his car in the parking lot. The three girls and a fourth girl named *548 Saundra got into their ear and left for Ju-lien’s. Major went to use the phone. Darlene Thompson was waiting to use the phone to call Hendrix, but Hendrix drove up at that point in a white station wagon with Patrick Jackson. As she was talking to Hendrix, two people rounded the corner. She immediately saw “Cornbread” and her attention was drawn to the very large gun he was carrying: a gun that was “longer than his arm.” She heard gunfire from two guns: one made a loud “boom”, the other a “pop.” She ran to some bushes where she was struck four times in the leg. She saw a red car pull up and two perpetrators get in and | .gdrive away. She could not identify the second perpetrator. She admitted on cross examination that while she was staying in the hotel, she identified Steven Bell as the second perpetrator.
Joyce Johnson said she saw the defendant and “Cornbread” fire the guns. The defendant had a smaller gun than “Cornbread.” She said the two of them robbed her brother on a previous occasion.
The defense called Spencer Dawson, a friend of the defendant, who testified he was on the scene and witnessed the shootings. He said he did not know the perpetrators but that the defendant was not one of them.
Herbert Fleming testified he knew the defendant, Wilson, Thompson, and Johnson. He said that he was at Michelle’s and that he did not see any of them there. He said he did not see Johnson outside of Julien’s. He witnessed the shooting, and said that the defendant was not one of the perpetrators.
Talia Anderson testified that the defendant came to her house at 2:15 a.m. on the morning of the crime. He was at her house when they heard the shots.
The parties stipulated that a woman named Connie Wilson viewed a photographic lineup and was unable to identify the defendant.
By his first assignment of error defendant argues the evidence was insufficient to support the conviction. He concedes that the State proved that someone killed the victim when that perpetrator had the specific intent to kill or inflict great bodily harm. He argues, however, that the State failed to identify the defendant as the perpetrator. He argues Johnson’s identification of him was unreliable and that the trial court allowed identification testimony that was hearsay evidence of identifications.
On the issue of Johnson’s identification of the defendant he argues that this was a one-on-one, in-court identification taking place nearly a year after the crime | 6and he cites a number of cases which have held that such identifications are unreliable. However, this case is not one where the victim or witness saw the defendant for the first time when the crime was committed and later identifies him from a lineup or in court. In this case Joyce Johnson had known the defendant for years and was his next door neighbor. When she saw him shooting on the night of murder she knew exactly who he was. Her identification of the defendant was ironclad because she knew him well. The cases he cites have no application to this situation.
Next, defendant argues that the “highly suspect” identification of defendant by Johnson was bolstered by hearsay identifications made by Major, who was absent from the trial, through the testimony of Bridgewater and by Hendrix, who was dead, through the testimony of Detective Mims. The pertinent part of Bridgewater’s testimony is as follows:
Q Did you go to Charity Hospital to see your son?
A Yes, I did.
[[Image here]]
Q Did Mark tell you who shot him?
MR. MEYER: Wait.
THE WITNESS: Yes, he did.
MR. MEYER: Wait, wait, wait. Wait. Judge, you know this is—
MS. PADUA: Your Honor—
THE COURT: All right. All right.
MR. MEYER: Judge, this is irresponsible.
THE COURT: I’m going to sustain your objection.
[[Image here]]
*549 Q Were you surprised by what Mark told you as to who shot him?
A Yes, I was.
MR. MEYER: Wait. Excuse me. Wait. Judge, I’m going to ask that either the D.A. is right in on this issue or we have a mistrial. I mean, I’m defending this man against an allegation that he killed someone else.
THE COURT: I’m going to sustain the objection. I’m going to sustain the objection as to whether or not she was surprised by what she had learned. I’ll sustain that objection.
|7The pertinent part of Mims’ testimony is as follows:
Q Okay. Now, before you got those arrest warrants, did you do any other interviewing, other than Darlene Thompson?
A Another person was interviewed. But I didn’t interview her at the time.
Q Okay. Did you review the information from the interviewer?
A Yes, I did.
Q And did you use that information to obtain any arrest warrants?
A Yes, ma’am.
Q Okay. Do you know the name of that other person?
A Yes. Tywanda Major.
Q Okay. Is that — is that somebody — a witness to the incident?
A Yes, ma’am.
Q Do you know whether or not any photographs were shown to Tywanda Major before you got your arrest warrants?
A Yes, ma’am.
Q And do you know when you got your arrest warrants?
A I got the arrest warrants on August the 5th at about seven (7:00) A.M.
Q Okay. And how many arrest warrants did you obtain in connection with the murder of Isaac Wilson?
A Three (3).
[[Image here]]
Q And you also obtained another warrant for whom?
A Just these three (3) warrants. One (1) for Troy West. One (1) for Steven Bell. And one (1) for Steve Evans.
[[Image here]]
Q And was Darlene Thompson — in looking at all of those photographs in the “State’s Exhibit Number Twenty-Six (26),” was she able to recognize any picture in that as being one (1) of the perpetrators?
A No, ma’am.
There are no hearsay identifications in this testimony. In Bridgewater’s ease she said only that she was surprised by what Hendrix told her as to who shot him. We cannot conclude that the only reasonable inference to be drawn from this statement is that Hendrix told her the defendant did it. He could have given another name which would have surprised her just as likely and as much as if the name was defendant’s.
As to Mims he was asked whether upon interviewing Darlene Thompson did he use that information to obtain any arrest warrants to which he answered yes. There followed this question and answer:
|gQ. And you also obtained a warrant for whom?
A. Just three (3) warrants. One (1) for Troy West. One (1) for Steven Bell. And one (1) for Steve Evans.
This testimony did not constitute an impermissible hearsay identification of defendant as one of the perpetrators. Thompson had testified that the only perpetrator she could identify was Evans. She did not identify the defendant as Joyce Johnson did. We interpret Mims’ testimony to mean that he was led directly to Evans from interviewing Thompson and based upon further investigation he obtained warrants for the three.
Even if defendant’s argument that the above testimony was inadmissible had merit the question on appeal would be to determine beyond a reasonable doubt that the improperly admitted hearsay did not contribute to the verdict. State v. Veals, 576 So.2d 566, 568 (La.App. 4th Cir.1991), writ denied 578 So.2d 931. In that case the court held that two of the factors to be considered *550 in making this determination are the importance of the witness’s testimony and the overall strength of the state’s case. This vague testimony about Bridgewater’s being surprised and Mims’ about issuing an arrest warrant for defendant along with Evans and Bell were not important. Bridgewater’s statement did not necessarily refer to the defendant which is the only way the testimony could be deemed important. As to Mims everyone on the jury had to know that the defendant had been arrested as a result of an investigation conducted by Mims and others. The statement that questioning any witness led to his arrest is a self evident truism present in practically every criminal ease. It has no importance.
Finally, considering the overall strength of the state’s case this testimony hardly contributed to the verdict. Johnson told the jury her long time neighbor and acquaintance who was the defendant shot Wilson. The jury believed her. If they | ¡Jiadn’t the case would have fallen apart. The appellate court does not second guess the jury on a credibility call of this nature. For our purposes we must accept it. It is also noteworthy that Johnson’s testimony was bolstered by that of Darlene Thompson who saw the defendant with Evans and Bell at Michelle’s Bar just around the corner before the shooting and who positively identified Evans as one of the shooters.
By his second assignment of error defendant contends that he was deprived of a fair trial when the state depicted him as a person who had threatened witnesses and encouraged others to do so, participated in the murder of Hendrix, and participated in a robbery. As to the threats, when Thompson testified to this effect the objection was based upon hearsay and was sustained. There was no motion for a mistrial. Interestingly, these threats were directly received by Thompson so that her testimony concerning them did not constitute hearsay. The proper ground for objection was that the testimony was of other crimes and the proper remedy was a motion for mistrial pursuant to C.Cr.P. art. 770. In this connection defendant is raising an argument not made in the trial court and not properly before this court.
Next defendant complains about the testimony of Mims that provided an inference that defendant killed Hendrix. Defendant objected and asked for an admonition which the court provided. There was no motion for a mistrial.
While the foregoing two assignments of error are without merit for the reasons stated it may be that evidence of direct threats and intimidation of witnesses and the coincidence of the murder of a key witness just one week after the murder in question, along with the facts that all of these individuals were generally together on the night of the subject murder, most of them were acquainted with one another, and some were quite close to one another, could be |10made available to the jury if properly presented in accordance with the rules of procedure. The state’s dereliction was its failure to provide notice in advance of the trial of intention to produce evidence of those other crimes. However, its failure to do so was waived by defendant’s failure to object on this particular ground. A defendant may not take the calculated risk of not moving for a mistrial and then, after being convicted, argue that he was deprived of a fair trial when he knowingly waived the proper remedy.
Finally, defendant argues that the state unfairly produced evidence that defendant had committed an armed robbery against Johnson’s brother. This is based on 'a single statement made by Joyce Johnson in her direct testimony. After identifying defendant as her former next-door neighbor in the Fischer Housing Project the following occurred:
Q. And when was that you were living in the Fischer Housing Project that you came to meet Nokie?
A. I had been seeing him around, until one (1) time he robbed my little brother.
A fair reading of the testimony shows that she blurted this out without any suggestion by or solicitation from the prosecutor. In cross examination by defense counsel the details of this robbery were given to the jury. The isolated statement made on direct examination can hardly be considered as prejudicial.
*551 Since the assignments of error and arguments discussed herein are without merit the conviction and sentence are affirmed.
AEFIRMED.
PLOTKIN, J., dissenting.